## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**TINA ELAINE TAYLOR,**

      **Plaintiff,**

**v.**                                                      **Case No.: 5:19-cv-00117**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**[1]

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 13, 16).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Commissioner of the Social Security Administration, Andrew M. Saul, is substituted for former Commissioner, Nancy A. Berryhill, as Defendant in this action.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In December 2014, Plaintiff Tina Elaine Taylor ("Claimant") filed applications for DIB and SSI, alleging a disability onset date of June 20, 2010 due to "ruptured hernias, high blood pressure, depression, fluid retention, rheumatoid arthritis, COPD, severe acid reflux, [and] high cholesterol." (Tr. at 11, 236-43, 292). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 11). Claimant filed a request for an administrative hearing, which was held on July 28, 2017 before the Honorable Raymond Rodgers, Administrative Law Judge (the "ALJ"). (Tr. at 61-94). During the hearing, Claimant amended her alleged onset date to July 9, 2016. (Tr. at 65). By written decision dated October 20, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 8-30). The ALJ's decision became the final decision of the Commissioner on December 19, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a Brief in Support of Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 13, 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 57 years old on her alleged onset date and 58 years old on the date of the ALJ's decision. (Tr. at 22). She completed four or more years of college, communicates in English, and previously worked as an assistant Head Start teacher, cashier and stocker at Kroger, and in-home caregiver. (Tr. at 68, 70, 85, 291, 293).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2020. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 9, 2016, the amended alleged

disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, obesity, bipolar disorder, cognitive disorder, somatoform disorder, attention deficit hyperactivity disorder (ADHD), and anxiety disorder. (Tr. at 14, Finding No. 3). The ALJ considered Claimant's hypertension, bronchitis, gastroesophageal reflux disease with hiatal hernia, rheumatoid arthritis, and vision problems, but the ALJ found these impairments to be non-severe. (Tr. at 14).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [she could] never climb ladders, ropes, or scaffolds and only occasionally climb ramp[s] and stairs. She may frequently balance, stoop, kneel, crouch, or crawl. The claimant can have no exposure to hazardous machinery or unprotected heights. She must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases and extreme cold, extreme heat, wetness, and humidity. The claimant is limited to simple, routine, and repetitive task[s]. She must work in a low stress job defined as occasional changes in the work setting and occasional decisionmaking. The claimant is limited to occasional interaction with the coworkers and supervisors and no interaction with the public.

(Tr. at 17-22, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 22, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine Claimant's ability to engage in other substantial gainful activity. (Tr. at 22-23, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1959 and was

defined as an individual of advanced age on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 22, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled medium-exertional level work as a linen room attendant, night stocker, or stocker. (Tr. at 22-23, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 23, Finding No. 11).

## IV.  <u>Claimant's Challenge to the Commissioner's Decision</u>

In her first assertion of error, Claimant argues that the ALJ only relied on facts from the record that supported his findings. (ECF No. 13 at 8). Specifically, Claimant asserts that the ALJ cited that Claimant cared for her disabled ex-husband, traveled to Arizona, and colored. In Claimant's view, evidence throughout the file demonstrated that these activities were not as significant as the ALJ found. (*Id.* at 9). Claimant contends that the in-home healthcare that she provided for her ex-husband was minimal and temporary. (*Id.* at 9-10). Regarding her trip to Arizona, Claimant maintains that the evidence actually shows that she was considering moving there and traveled to evaluate whether the climate change would ease her pain, but she was uncomfortable during the flight, required wheelchair transport in the airport, and was unable to do much of anything other than stay in her motel room during her trip. (*Id.* at 10). Finally, regarding the ALJ's conclusion that Claimant's visual impairments were not severe because she

colored pictures, Claimant states that the ALJ failed to consider evidence that she had trouble reading and decreased acuity. (*Id.* at 10-11). Claimant cites that the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") held in *Lewis v. Berryhill*, 858 F.3d 858, 859 (4th Cir. 2017) that an ALJ cannot cherry-pick facts that support a finding of non-disability, while ignoring evidence that points to a disability finding. (*Id.* at 11). In her second assertion of error, Claimant argues that the ALJ did not supply "good reasons" for rejecting the opinion of her treating optometrist, Donald Taylor, O.D., regarding her vision issues. (*Id.* at 11-13).

In response to Claimant's arguments, the Commissioner adduces that the ALJ accurately characterized the evidence in making his disability determination, not only by pointing to Claimant's activities, but by thoroughly discussing and citing to Claimant's medical records. (ECF No. 16 at 11-15). In addition, the Commissioner contends that the ALJ properly considered Dr. Taylor's opinion in accordance with relevant Social Security Rulings and Regulations. (*Id.* at 15-17)

## V.    **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### *A. Claimant's Statements*

Claimant testified during her administrative hearing on July 29, 2017 that, although her alleged disability onset date was July 9, 2016, she did not stop working until March or April 2017. (Tr. at 68, 70). She explained that in the first quarter of 2017, she worked as a paid caregiver for two hours per day, six days per week. (Tr. at 68, 70). She cared for her ex-husband, who lived in the downstairs of her home. He had a metal leg and was having "temporary problems" with his knee before he started receiving

injections. (Tr. at 71). She helped him shower, put lotion on him, cooked meals for him twice per day, and otherwise "basically just watched him that he didn't fall." (Tr. at 71-72). Claimant testified that, prior to working as an in-home caregiver for her ex-husband, she worked part-time at Kroger through the fourth quarter of 2016. (Tr. at 68). Claimant stated that she was "yelled at" for being too slow as a cashier, and she was reassigned to stock the liquor department, but she was unable to lift "too heavy liquor bottles" and she told her employer that she could not do the job. (*Id.*).

In terms of physical impairments, Claimant stated that she went on daytime oxygen in April 2017 and now required her own home healthcare worker one and one-half hours per day, five days per week. (Tr. at 74-76). Claimant testified that she primarily needed assistance due to her loss of balance, and the caregiver helped her shower and dress. (Tr. at 75). Claimant stated that she also used a cane to maintain her balance. (Tr. at 76). Claimant testified that, due to back pain and getting "winded," she could only lift one-half gallon of milk; stand for a few minutes; walk for five minutes, at the most; and sit for 45 minutes. (Tr. at 77, 82). Also, Claimant stated that her vision was blurry. (Tr. at 83). According to Claimant, she could not see small things and sometimes could not see big things either, attributing her poor vision to "terrible" eye cysts. (*Id.*). Claimant testified that she could only read for a few minutes at a time and could not read at all on some days. (*Id.*).

Regarding mental impairments, Claimant testified that she had issues with her memory and could not remember things when she was being trained in the workplace. (Tr. at 79). Claimant stated that because she was "so old" she could only remember to do very simple things. (*Id.*). Claimant further testified that she had panic attacks and anxiety every single day.  (Tr. at 81). Claimant stated that she mainly spent the day coloring in

coloring books. (Tr. at 77). In a typical day, Claimant woke up, made a light breakfast, watched the news, sometimes read the Bible, got out her coloring book, and colored. (Tr. at 80). She noted that her children were 18 and 19 and were self-sufficient, and her ex-husband had resumed taking care of himself. (Tr. at 78, 80).

Claimant acknowledged that her daughter recently paid for Claimant and her ex-husband to travel to Arizona to evaluate whether it would help their pain. (Tr. at 80). She was on the first flight for at least two hours, but she said that it was uncomfortable and she had to get up two or three times to use the bathroom; also, she and her husband were transported to their next plane via wheelchairs in the Charlotte, North Carolina airport. (Tr. at 82-83). Claimant testified that she stayed in Arizona for about a week during which she mostly stayed in the motel room, but Claimant admitted that her "pain was less out there." (Tr. at 81). Claimant concluded her testimony by declaring that she was "just too old to work." (Tr. at 84).

### B. Treatment Records

#### 1. Prior to Alleged Onset of Disability

On March 14 and December 18, 2014, and February 9, 2015, Claimant saw her optometrist Donald Taylor, O.D. During the visits, Claimant's corrected visual acuity was 20/25 bilaterally. (Tr. at 750, 751, 753).

The next year, on April 15, 2016, Claimant presented to her family medicine physician, Christopher Kincaid, M.D., at Access Health Rural Acres. Claimant was trying to walk one mile per day for exercise, and it did not seem to cause any pain. (Tr. at 805). She planned on taking a vacation to Los Angeles the next month. (*Id.*). Claimant denied having blurry vision or shortness of breath, and there were no issues noted on her respiratory, cardiovascular, musculoskeletal, or neurological examinations. (Tr. at 806).

## 2. After Alleged Onset of Disability

Claimant followed up with Dr. Kincaid on July 14, 2016. Her chief complaints were worsening depression and arthritis. (Tr. at 801). She explained that she was seeing her psychiatrist, Jamie Cichon, M.D., every two months, but she stopped seeing a psychologist because she did not have time due to her new job as a cashier at Kroger. (*Id*.). Claimant also stopped taking her antidepressant, and Dr. Kincaid discussed that Claimant should work closely with Dr. Cichon regarding her mental health treatment. (*Id*.). Regarding physical issues, Claimant denied having blurred vision or shortness of breath, and she had no issues in her respiratory, cardiovascular, musculoskeletal, or neurological examinations. (Tr. at 801-02). Her gait and station were normal. (*Id*.). Dr. Kincaid encouraged Claimant to continue walking for exercise. (Tr. at 801-02). He assessed that Claimant's anxiety and depression were stable, her hypertension and abdominal pain were improved, and Claimant had COPD. (Tr. at 802).

On November 9, 2016, Claimant saw Homer Lester, PA-C, in conjunction with Dr. Cichon at Appalachian Psychiatric Services. Claimant's diagnoses included unspecified single episode major depressive disorder; ADHD, primarily inattentive type; and unspecified anxiety disorder. (Tr. at 879). She was prescribed Valium, desipramine hydrochloride, Protonix, Strattera, and Topamax. (*Id*.). Claimant stated that the medications were working well for her and she would like to continue the same treatment. (*Id*.). She was eating and sleeping well, and her mood was stable. (*Id*.). Claimant pronounced that her husband was "having a lot of issues with his pain and mobility," and she was "having to take more care of him." (*Id*.). She was also working part-time and felt like she had a lot on her plate, but she was "doing ok." (*Id*.).

Claimant's gait and stance were noted to be normal during her visit with Dr. Cichon on August 18, 2016. (Tr. at 843). On September 15, 2016, Claimant told PA-C Lester that Valium was helping her anxiety and she was "doing ok," but she still felt depressed. (Tr. at 875). Claimant noted that she gained weight and believed it was due to her not being as active in her new job as a cashier. (*Id*.). Claimant's mental status examination was normal with the exception of her depressed mood. (*Id*.). PA-C Lester diagnosed Claimant with a somatization disorder in addition to her previously-diagnosed conditions. (*Id*.). He renewed Claimant's medications and scheduled her for counseling. (Tr. at 876).

On September 27, 2016, Claimant told Dr. Kincaid that she did not have any chronic pain, but she did suffer abdominal pain for two days. (Tr. at 855-56). Claimant disclosed that she gained weight, and her heartburn was always worse when her weight increased. (Tr. at 856). Claimant's gait was normal during the visit. (Tr. at 857). Dr. Kincaid wrote a short-term prescription for Dexilant and gave Claimant samples of Nexium. (Tr. at 858).

Claimant followed up with Dr. Cichon on October 13, 2016. She alleged that she was still depressed, but she also reported that she felt "significantly better." (Tr. at 877-78). Dr. Cichon recorded normal findings on Claimant's mental status examination and renewed Claimant's prescriptions. (*Id*.).

On October 20, 2016, Claimant advised Dr. Kincaid that her breathing was stable, she did not have any chronic pain, medication significantly helped her reflux, her depression was improved, and she was caring for her ex-husband, who could not walk. (Tr. at 851-52). The clinical findings during Claimant's physical examination were all normal, including normal gait. (Tr. at 852-53).

During Claimant's subsequent visit with Dr. Kincaid on December 2, 2016, she complained of shortness of breath. (Tr. at 847). Claimant told Dr. Kincaid that she became "winded" when walking reasonable distances and when walking up stairs, and she had to use her rescue inhaler twice each day. (Tr. at 848). On examination, Claimant's oxygen saturation level was 98 percent and it dropped to 82-83 percent when she walked two laps up and down the hall. (Tr. at 847-48). She disclosed that she lost her job at Kroger and was now paid to care for her ex-husband, who lived in the downstairs of her house. (Tr. at 848). Claimant admitted that her ex-husband smoked inside of the house. (*Id.*). Dr. Kincaid ordered pulmonary function and overnight oxygen tests, and renewed Claimant's inhaler prescriptions. (Tr. at 849-50). He encouraged Claimant to stay well hydrated, limit caffeine, exercise, prohibit her ex-husband from smoking in the home, and follow up with psychiatry. (*Id.*). Claimant's pulse oximetry test was performed on December 14, 2016, and it indicated that Claimant qualified for supplemental nocturnal oxygen. (Tr. at 869). On December 16, 2016, Dr. Kincaid prescribed Claimant an oxygen concentrator and nasal cannula for nocturnal usage. (Tr. at 870).

On January 3, 2017, Claimant saw Dr. Kincaid for an acute visit because she was concerned about high blood pressure. (Tr. at 941). However, Dr. Kincaid explained to Claimant that her blood pressure was stable, and it had been stable during Claimant's last few visits. (*Id.*). Claimant reported weakness and shortness of breath, but she denied any vision changes. (*Id.*). She was ambulating normally, and her physical examination was normal, including no issues with her eyes, lungs, cardiovascular and musculoskeletal systems, or abdomen. (Tr. at 941).

Claimant followed up with Dr. Cichon on January 10, 2017. Claimant proclaimed that she was seeking disability benefits and stated that her children hated her because she

13

could not work. (Tr. at 881). Claimant was tearful during the examination and displayed signs of anxiety/panic/agoraphobia. (*Id.*). Dr. Cichon advised Claimant to seek in-patient mental health treatment. (*Id.*). Claimant explained that she was the primary caregiver for her ex-husband, and she needed to make arrangements before seeking care. (Tr. at 881, 884). Claimant was noted to have "caregiver burnout." (Tr. at 886). She was voluntarily admitted to Beckley Appalachian Regional Healthcare on January 13, 2017 for failure to titrate outpatient medications, suicidal ideations, issues with treatment resistant depression, and poor coping skills. (Tr. at 884, 894). Claimant expressed that she began having suicidal thoughts one and one-half years ago when she lost her "good paying job." (Tr. at 921). Claimant stated that people at her job were cruel to her for six weeks. (*Id.*). She reported that she could not find a good job since then and filed for disability. (*Id.*). Claimant described that she lived in a home with her two teenaged children and her ex-husband, who was dependent on her financially and required her care. (*Id.*). While in the hospital, Claimant also saw Mustafa Rahim, M.D, regarding her physical complaints. (Tr. at 896). Claimant had a history of hypertension and lower extremity swelling for which she was continued on a diuretic. (Tr. at 898). She was continued on a nebulizer for COPD and Protonix for reflux, and Dr. Rahim prescribed Zocor for hyperlipidemia. (*Id.*). Claimant reported that mental health treatment was beneficial, and she was discharged on January 15, 2017, two days after her admission. (Tr. at 894).

Claimant presented to Dr. Cichon on January 24, 2017, emphasizing that she was "so much better" after her hospitalization. (Tr. at 931). Dr. Cichon noted that Claimant's mood was better; she had no symptoms of depression; and she was accepting of her bipolar diagnosis. (*Id.*). However, Claimant displayed perseverative thinking about obtaining disability and asked Dr. Cichon for assistance in obtaining benefits. (*Id.*). Two

days later, Claimant again told Dr. Cichon that she needed to obtain disability benefits, and stated that it depended on Dr. Cichon's evaluation. (Tr. at 933). Dr. Cichon noted that she would go over it with Claimant at her next appointment and would hold the paperwork that she completed until Claimant could review it. (Tr. at 933-34).

On February 16, 2017, Claimant presented as a new patient to Angela Pendleton, D.O., indicating that she was previously seeing Dr. Kincaid, but wanted to begin seeing Dr. Pendleton instead. (Tr. at 944). Claimant's physical examination did not reveal any abnormalities. She had normal ambulation, muscle tone and strength, sensation, and coordination; no shortness of breath; good air movement; and no other respiratory issues. (Tr. at 945). Claimant also denied having any blurry vision or other problems with her eyes. (*Id.*).

On February 21, 2017, Dr. Cichon again recorded that Claimant had ongoing personality factors and social stressors causing intermittent depression, but she was improving with medication and therapy without any new concerns. (Tr. at 935). During Claimant's appointment with Dr. Pendleton on March 8, 2017, Claimant's gait was slow and wide-based, and Claimant touched the wall for balance. (Tr. at 950). Dr. Pendleton prescribed Claimant a quad cane. (*Id.*). Nevertheless, Claimant had normal range of motion, motor strength, and muscle tone on examination; Claimant denied blurry vision; and the results of Dr. Pendleton's examination of Claimant's eyes and lungs were normal. (Tr. at 949-50).

Claimant saw Dr. Taylor on March 13, 2017. He stated that Claimant's visual acuity was decreased in Claimant's left eye, but he did not note Claimant's specific visual acuity test results. (Tr. at 981). Dr. Taylor listed that Claimant had macular edema in her right eye, a conjunctival cyst on her left eye, and "visual disturbance." (*Id.*). He identified that

her retina felt a little better, but it was still sore. (*Id.*).

Claimant presented to Dr. Pendleton again on March 30, 2017 for follow-up regarding her chronic conditions. She was doing well on medications for COPD, chronic constipation, hypertension, and hyperlipidemia. (Tr. at 953-54). Her gait was still slow and wide-based, and Claimant touched the wall for balance. (Tr. at 954).

On March 21, April 4, and May 9, 2017, Claimant presented to Dr. Cichon. Claimant still reported psychological complaints, but her mental status examinations were normal, except for a depressed mood. (Tr. at 994, 997, 999). Dr. Cichon renewed Claimant's medications. (Tr. at 995, 998, 1000). In the interim, on April 2, 2017, Claimant had a chest x-ray to evaluate her complaints of shortness of breath, cough, and weakness. (Tr. at 1006). The x-ray showed that Claimant's heart and mediastinal contours were normal; her lungs were adequately aerated and clear; and her bony thorax was intact. (*Id.*). It was a negative examination. (*Id.*).

Claimant saw Dr. Taylor on June 1, 2017. He did not note or discuss Claimant's visual acuity, but recorded that Claimant still had a left eye cyst. (Tr. at 980). On June 13, 2017, Dr. Cichon noted that Claimant had continued personality factors and social stressors, and she was still very upset that Dr. Cichon was leaving the practice. However, Claimant was doing well on medications without side effects. (Tr. at 987-88). Claimant was not amenable to tapering her prescription for Valium despite the fact that Dr. Cichon advised her of the cognitive risk. (Tr. at 988). There were no issues on Claimant's mental status examination, and no changes were made to her medications. (*Id.*). Dr. Cichon discussed non-compliance with Claimant, because Claimant had missed her counseling appointment. (*Id.*).

16

Claimant presented to Kyle Muscari, D.O., on June 14, 2017. Her GERD was stable and managed by medication, and she denied any new medical problems or complaints. (Tr. at 1004). Claimant was ambulating normally. (Tr. at 1004). She declared that she did not have any issues walking, climbing stairs, or serious difficulty seeing. (*Id.*). Her respiratory, cardiovascular, psychiatric, musculoskeletal, and neurological examinations were normal. (Tr. at 1004-05).

On July 3, 2017, Claimant saw Dr. Pendleton for a routine follow-up appointment regarding her chronic conditions. Claimant was doing well and expressed that she did not have any complaints. (Tr. at 1012). She walked without restrictions, again stating that she had no issues walking or climbing stairs. (*Id.*). Claimant also denied having any serious difficulty seeing; shortness of breath; or issues with concentrating, remembering, or making decisions; dressing; bathing; or running errands alone. (*Id.*). There were no abnormalities in her physical examination, including normal musculoskeletal, respiratory, and neurological findings. (Tr. at 1013). Dr. Pendleton renewed Claimant's medications for hypertension, allergic rhinitis, and GERD. (*Id.*).

Later that month, on July 13, 2017, Claimant saw Felicia Smith, PA-C, in conjunction with psychiatrist, Safiullah Syed, M.D., at Appalachian Psychiatric Services. Claimant stated that she was devastated that Dr. Cichon was gone, because she was "the only doctor who has ever given her the medications she needed to help her." (Tr. at 1019). Claimant was advised that she needed to start receiving treatment from her primary care provider for her physical issues because her mental health providers were not going to continue prescribing medications for those conditions. (*Id.*). In addition, the providers refused to prescribe both Ranidine and Famidine and advised Claimant that she could not take Robaxin in addition to Valium. (*Id.*). Claimant was "not happy" with the outcome of

the visit, but she mentioned that she just returned from Phoenix, Arizona and had a "great time while there." (*Id.*). Claimant's mental status examination was normal, and she had normal gait. (Tr. at 1019-20).

On July 17, 2017, Claimant told Dr. Pendleton that she needed a portable oxygen bag and stated that her depression had increased since Dr. Cichon left town. (Tr. at 1016). Claimant stated that she was unsure whether she still needed a psychiatrist. (*Id.*). On examination, Claimant had poor insight; was anxious, depressed, and agitated; and had abnormal recent and remote memory. (Tr. at 1017). However, in terms of physical conditions, Claimant was ambulating normally and denied having any numbness, weakness, tingling, burning, or shooting pain. (Tr. at 1016-17). Claimant also denied having any blurry vision, other vision issues, or shortness of breath. (Tr. at 1016). Claimant's respiratory examination was normal, confirming that she had no shortness of breath, wheezing, rales/crackles; normal breath sounds; and good air movement. (Tr. at 1017). Claimant further had normal motor strength and tone; normal movement in all extremities;; grossly intact sensation; and normal gait and station. (*Id.*). Claimant was instructed to contact her pulmonologist regarding her request for an oxygen bag, and she was given a psychiatry referral. (*Id.*).

### C. Evaluations and Opinions

On May 5 and August 17, 2015, Amy Wirts, M.D., and Caroline Williams, M.D., respectively, found insufficient evidence to evaluate Claimant's disability applications. (Tr. at 113, 125). On February 1, 2017, Dr. Cichon completed a mental assessment form, stating that Claimant had moderate, marked, and extreme mental functional limitations. (Tr. at 928-29). The following month, on March 13, 2017, Claimant's optometrist, Dr. Taylor, wrote on a prescription pad that Claimant was having a number of health issues,

18

including poor vision and balance that were preventing her from working. (Tr. at 937). Dr. Taylor stated that Claimant's eye issues included macular edema and blurred vision that were permanent conditions. (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir.

2005) (citing *Craig*, 76 F.3d at 589).

## VII.  <u>Discussion</u>

### A. Characterization of the Evidence

Claimant first argues that the ALJ mischaracterized the evidence by selecting certain facts from the record at the exclusion of contrary evidence in order to find that Claimant was not disabled. (ECF No. 13 at 8). Specifically, Claimant asserts that the ALJ focused on the activities that Claimant cared for her disabled ex-husband, traveled to Arizona, and colored pictures. According to Claimant, evidence throughout the file demonstrated that the activities were not as significant as the ALJ found. (*Id.* at 9-11). Namely, Claimant asserts that she provided minimal, temporary care for her ex-husband; her trip to Arizona was uncomfortable and she only took it to find out whether the climate eased her symptoms; and evidence showed that Claimant had trouble reading and decreased visual acuity.

An ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the

pain or other symptoms alleged." 20 C.F.R. § 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources; (2) objective medical evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques; and (3) any other evidence relevant to the claimant's symptoms, such the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication, medical treatment, and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable

evidence to consider may include (1) A longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be

expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ's analysis of Claimant's allegations began at the second step of the sequential evaluation. At step two, the ALJ found that Claimant had severe physical and mental impairments, but the ALJ concluded that, despite Claimant's reported blurry vision and inability to read small and big things, her visual acuity was 20/25 in her records; she worked as a cashier and stock clerk until December 2016; and, although the records mention macular edema, her most recent records reveal that Claimant did not report any problems regarding her vision. (Tr. at 14). The ALJ stated that Claimant, in fact, traveled to Arizona without any reported vision issues, and Claimant testified that she colored a lot and read. (*Id.*). Therefore, the ALJ found that Claimant's vision problems were non-severe. (*Id.*). In the step three analysis, regarding Claimant's obesity and paragraph B criteria, the ALJ noted that Claimant retained the ability to work in early

2017 caring for her ex-husband and the ALJ again noted that Claimant worked at Kroger as a stocker/cashier until December 2016, traveled to Arizona, read, and colored, all of which were probative of her mental and physical functional abilities. (Tr. at 15-16).

In the RFC discussion, the ALJ documented the two-step process to evaluate Claimant's reported symptoms. The ALJ noted Claimant's complaints that she started using daytime oxygen in April 2017, had back pain, required the assistance of a home health worker to help her shower and dress, and had other physical and mental symptoms. (Tr. at 17). The ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*). For instance, the ALJ discussed that despite Claimant's allegations of back pain and breathing and balance problems, records showed that Claimant walked for exercise at the time of her alleged onset of disability in July 2016; had many normal musculoskeletal and respiratory examinations through the conclusion of her medical records in 2017; was only prescribed nighttime oxygen; worked part-time at Kroger until December 2016; cared for her ex-husband in 2017; traveled to Arizona during the relevant period and sat for at least two hours on the plane; and ambulated normally through the conclusion of her medical records. (Tr. at 18-20). Furthermore, the ALJ found that there was no mention in any of Claimant's records that she had a home health aide. In fact, Claimant stated to her physician on July 3, 2017 that she had no issues walking, climbing stairs, dressing, bathing herself, or running errands. (Tr. at 20).

In terms of her mental impairments, the ALJ noted Claimant's reported anxiety and memory problems, two-day hospitalization, and diagnosis of bipolar disorder in

24

January 2017. (Tr. at 20). However, the ALJ cited that Claimant reported that she was doing much better after the hospitalization and Claimant's psychiatrist recorded that Claimant's mental status was normal, and she was doing well and tolerating her medications without side effects. (*Id.*). The ALJ noted that Claimant's psychiatrist even mentioned that Claimant was taking care of her ex-husband and traveled to Arizona. (*Id.*).

As shown above, the ALJ articulated well-reasoned support for his conclusion that Claimant's allegations were not entirely consistent with the record. Claimant's assertion that the ALJ "cherry-picked" evidence that supported his findings and omitted contrary evidence is not borne out by the written decision. The ALJ considered Claimant's allegations and compared to them to the entire record, including Claimant's contrary statements to her medical providers and the objective evidence, documenting the various inconsistencies that he found. The ALJ's analysis of the evidence is supported by substantial evidence. Claimant testified on July 29, 2017 that she went on daytime oxygen in April 2017. (Tr. at 74). She alleged that she "got winded easily," which limited her ability to perform physical functions. (Tr. at 77, 82). Although Claimant was prescribed nocturnal oxygen, there was no mention in Claimant's medical records that Claimant was prescribed supplemental oxygen during the day. Rather, on July 17, 2017, Claimant requested an oxygen bag from her primary care physician, and he told her to contact her pulmonologist. (Tr. at 1017). There is no documentation that Claimant followed up with her pulmonologist or was ever prescribed oxygen during the day. Moreover, Claimant did not have shortness of breath or other respiratory issues during her July 3 and 17, 2017 medical appointments. (Tr. at 1012-13, 1016-17).

The record was also inconsistent with Claimant's allegations that she could only stand for a few minutes, walk for five minutes at the most, needed to use a cane to

maintain balance, and required a home healthcare worker to help her shower and dress. (Tr. at 74-77, 82). Dr. Pendleton recorded that Claimant's gait was abnormal at two visits in March 2017, and he prescribed a quad cane. (Tr. at 950, 954). However, Claimant's subsequent records did not mention that Claimant had an unsteady gait or used a cane. Rather, as late as July 2017, Claimant was ambulating normally without any restrictions at all. (Tr. at 1012-13, 1016-17, 1019). Claimant specifically told Dr. Pendleton on July 3, 2017 that she did not have any issues walking, climbing stairs, dressing, bathing, or running errands alone. (Tr. at 1012). There were no abnormalities in Claimant's musculoskeletal and neurological examinations at that visit or any other visit. (Tr. at 1013). As late as July 17, 2017, Claimant denied having any weakness, numbness, tingling, burning, or shooting pain. (Tr. at 1016-17). She had full motor strength, normal muscle tone, unrestricted movement in her extremities, grossly intact sensation, and normal gait and station. (Tr. at 1017). There was never any mention that Claimant required a home health aide.

In terms of her eyesight, while Dr. Taylor noted Claimant's eye cyst, macular edema, visual disturbance, and unquantified decreased visual acuity in March 2017, Claimant denied having blurry vision or any serious trouble seeing in July 2017. (Tr. at 1012, 1016). She testified at her administrative hearing only weeks after her July appointments that she could not see small things and sometimes could not see big things either, yet she admitted that she spent most of the day coloring in coloring books and also watched the news and sometimes read the Bible. (Tr. at 77, 80, 83). The only recorded visual acuities in the file documented that Claimant's far vision with her prescription was 20/25. (Tr. at 750, 751, 753).

Finally, regarding mental issues, Claimant expressed in July 2017 that she was upset that her psychiatrist, Dr. Cichon, left the practice. (Tr. at 1016, 1019). Her primary care physician noted that she was anxious, depressed, and agitated with poor insight and abnormal remote and recent memory. (Tr. at 1016). However, Claimant questioned whether she even "still needed a psychiatrist." (*Id.*). Dr. Cichon's final visit with Claimant on June 13, 2017 documented no issues with Claimant's mental status and no changes to Claimant's medications. (Tr. at 988). Claimant's new psychiatrist and physician assistant likewise found Claimant's mental status to be entirely normal on July 13, 2017. (Tr. at 1019-20).

In sum, the ALJ's conclusion that Claimant's allegations did not reconcile with the record is supported by more than a scintilla of evidence. *Blalock*, 483 F.2d at 776 (stating that substantial evidence is defined as more than a mere scintilla, but less than a preponderance of evidence). The ALJ considered the entire record, weighed the evidence, and made appropriate factual and credibility findings.

Claimant's attempt to analogize this case to the Fourth Circuit's decision in *Lewis* is unpersuasive. In *Lewis*, the Fourth Circuit considered on appeal a claimant's argument that "the ALJ failed to satisfactorily explain his decision not to credit her subjective complaints of chronic, non-exertional pain in her upper left extremity." *Lewis*, 858 F.3d at 865. The Fourth Circuit remanded the case based on three flaws in the ALJ's decision. First, the ALJ discounted the claimant's subjective evidence of pain solely based on the lack of objective evidence, which contravened Social Security law. *Id.* at 866. Second, the ALJ's cursory analysis of the treating physicians' opinions overlooked critical aspects of the claimant's treatment history, such as the fact that all medical professionals that examined her consistently expressed that she suffered from significant, debilitating pain

in her neck and upper extremity. *Id.* at 867-68. Finally, the Fourth Circuit found that the ALJ inappropriately characterized the claimant's treatment as conservative despite the fact that she was prescribed Fentanyl and Oxycodone; endured multiple surgeries, including removal of a rib in an attempt to alleviate her pain; and underwent injections, nerve blocks, and ablation procedures. *Id.* at 868-69. Therefore, based on the fact that the ALJ applied improper legal standards to discredit the claimant's subjective symptoms and treating physicians' opinions, and the ALJ failed to adequately explain the reasons for denying benefits despite the claimant's extensive medical history, the Fourth Circuit vacated the decision and remanded the matter to the Agency for further review. *Id.* at 870.

Here, the ALJ considered all of the evidence and found that Claimant's allegations were not fully credible, in great part, due to the fact that her allegations were inconsistent with the medical evidence and her daily activites. Unlike the ALJ in *Lewis*, the ALJ did not ignore probative evidence indicating Claimant's disability or fail to comply with the law in making his findings. Therefore, taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis and characterization of the evidence.

### B. Treating Physician's Opinion

Claimant's second challenge to the Commissioner's decision contends that the ALJ did not supply "good reasons" for rejecting the opinion of her optometrist, Dr. Taylor. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including

[his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability.[2] *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's applications were filed in 2014. Thus, the undersigned applied the law in effect at that time.

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion.[4] *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative

---

[4] Although the regulations provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ noted Dr. Taylor's March 13, 2017 opinion that Claimant's health issues, including poor vision and balance, prevented her from working. (Tr. at 21). The ALJ cited Dr. Taylor's statement that Claimant's eye issues included macular edema and blurred vision, which were permanent. (*Id.*). However, the ALJ gave little weight to the opinion, finding that it was inconsistent with Claimant's recorded 20/25 visual acuity

and her activities of daily living, which included working part-time, caring for her disabled ex-husband, vacationing in Arizona, and coloring. (*Id.*). The ALJ further noted that Dr. Taylor gave no function-by-function limitations, indicating the restrictions were based on Claimant's subjective allegations. (*Id.*). Further, the ALJ found that Dr. Taylor's opinion was inconsistent with Claimant's own report of no blurred vision and normal ambulation to her primary care provider. (*Id.*).

Claimant does not assert that Dr. Taylor's opinion should have been given controlling weight, but she argues that the ALJ did not give "good reasons" for affording the opinion little weight. (ECF No. 13 at 11-16). Claimant faults the ALJ for citing her 20/25 corrected vision from records that predated her alleged onset of disability. (Tr. at 750, 751, 753). However, there were no other recordings of Claimant's visual acuity in the file. In March 2017 Dr. Taylor stated that Claimant had macular edema in her right eye, a conjunctival cyst in her left eye, and "visual disturbance." (Tr. at 981). He appeared to note the Claimant's visual acuity was decreased in her left eye, but he did not document Claimant's visual acuity. (*Id.*). Again, in June 2017 and April 2018, Dr. Taylor noted Claimant's eye conditions, but he did not record Claimant's visual acuity. (Tr. at 980, 984).

Meanwhile, Claimant consistently denied having any blurry vision through July 2017. (Tr. at 801, 805, 941, 945, 949, 1016). In addition, despite Dr. Taylor's opinion that Claimant had poor balance, Claimant's gait was abnormal at visits in March 2017 and she was prescribed a cane, but she walked normally and without assistance before and after those appointments. (Tr. at 802, 806, 843, 853, 941, 945, 1004, 1012, 1016, 1019). As noted, Claimant walked without any restrictions as late as July 2017. (Tr. at 1016). The normal examination findings were far from "isolated" occurrences, as Claimant argues in

32

her brief. (ECF No. 13 at 15). Rather, the normal physical findings comprise nearly the entire record. It is clear that the ALJ properly evaluated and weighed the medical evidence and Claimant's daily activities, thoroughly documenting his findings with proper citations to the record. For the foregoing reasons, the record substantially supports the ALJ's determination that Dr. Taylor's opinion was entitled to little weight.

The undersigned **FINDS** that the ALJ analysis of Dr. Taylor's opinion complied with the applicable Social Security rules and regulations, and the weight assigned to the opinion is supported by substantial evidence.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 13); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 16); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge

for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  October 3, 2019

Cheryl A. Eifert
United States Magistrate Judge